```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------------------------------X
     REGINALD JOHNSON and NICOLE AGOSTINI,
 3
                                    PLAINTIFFS,
 4

 5             -against-            Case No:
                                    13 CV 7173(ARR)(VMS)
 6

 7   CITY OF NEW YORK, ROBERT MAYER, VINCENZO DIMARTINO, DAVID
     GRIECO, and JOHN DOES 2 - 4,
 8
                                    DEFENDANTS.
 9   ------------------------------------------------------X

10

11                  DATE: November 12, 2014

12                  TIME: 10:48 A.M.

13

14

15             DEPOSITION of a Non-Party Witness, JULIA

16   STERLING, taken by the Defendant, pursuant to a Subpoena

17   and to the Federal Rules of Civil Procedure, held at the

18   offices of the New York City Law Department, 100 Church

19   Street, New York, New York 10007, before Deborah Garzaniti,

20   a Notary Public of the State of New York.

21

22

23

24

25
```

J. STERLING

1  A.  That he was bringing a lawsuit against the Police
2  Department.
3  Q.  Did he explain to you that it was in connection
4  with the events of November 23, 2012?
5  A.  Yes.
6  Q.  Did he explain to you what, I guess, the claims
7  in the lawsuit were, as his understanding?
8  A.  No.
9  Q.  Did you ask?
10 A.  No.
11 Q.  As you sit here today, do you have an
12 understanding as to what Mr. Johnson, Reginald Johnson, is
13 alleging in his lawsuit?
14 A.  No.
15 Q.  Putting aside I guess a legal question, do you
16 have an understanding, just factually, what he is claiming
17 happened to him that day?
18 A.  That they entered the apartment illegally.
19 Q.  Why don't we just turn to the underlying events.
20 My understanding, and again, just so we are clear, is that
21 the events took place on November 23, 2012, does that sound
22 right to you?
23 A.  Yes.
24 Q.  At some point on that day, did you come into
25 contact with the police?

J. STERLING

1   A.   Yes.
2   Q.   About when did that take place?
3   A.   When he was in my kitchen.
4   Q.   Do you remember about what time that was?
5   A.   No, I don't.
6   Q.   Do you know if it was --
7   A.   It was in the evening time, I know that. The
8   specific time, I don't know.
9   Q.   Do you recall what day of the week that was?
10  A.   No.
11  Q.   Do you know if it was a weekday, weekend?
12  A.   I don't remember.
13  Q.   Was anyone else home at the time that you first
14  came into contact with police?
15  A.   Yes.
16  Q.   Who?
17  A.   My husband.
18  Q.   He was actually present at the time that you
19  encountered police?
20  A.   When I encountered them?
21  Q.   Yes.
22  A.   He was not present with me, but he was present in
23  the house.
24  Q.   Can you just describe your home? I think you
25  said it is a private dwelling?

J. STERLING

| | | |
|---|---|---|
| 1 | A. | It is a duplex. |
| 2 | Q. | Do you occupy the entirety of it? |
| 3 | A. | Yes. |
| 4 | Q. | How long have you lived at that address for? |
| 5 | A. | About 15 years. |
| 6 | | MR. LUMER: Off the record. |
| 7 | | (Whereupon, an off-the-record discussion was |
| 8 | | held.) |
| 9 | Q. | How many floors does the dwelling have, levels? |
| 10 | A. | Three. |
| 11 | Q. | Of those three floors, how many do you occupy? |
| 12 | A. | Two. |
| 13 | Q. | Who occupies the third? |
| 14 | A. | My tenants. |
| 15 | Q. | Did you have a tenant on November 23, 2012? |
| 16 | A. | Yes. |
| 17 | Q. | Who was that? |
| 18 | A. | It was my daughter living at that time. |
| 19 | Q. | I apologize. Was that -- |
| 20 | A. | No. |
| 21 | Q. | What was her name? |
| 22 | A. | Her name is Annette Thomas. |
| 23 | Q. | So when you said earlier that you have a duplex, |
| 24 | | so we are clear, the duplex is the ground level floor and |
| 25 | | the basement? |

J. STERLING

1     A.     Yes.
2     Q.     Then what would be I guess we consider the second
3     floor of the dwelling is occupied by tenants?
4     A.     Yes.
5     Q.     How were you first made aware that police were
6     inside of your home?
7     A.     I seen them.
8     Q.     The first time you saw the police officer, where
9     was he?
10    A.     He was walking passed me going towards the
11    kitchen towards the backyard.
12    Q.     Was he already inside of your home?
13    A.     Yes, he was.
14    Q.     Can you describe this officer?
15    A.     It was a white male.
16    Q.     Was he in a police uniform or regular clothing?
17    A.     Regular clothes.
18    Q.     What was his skin complexion?
19           MR. LUMER:  The color?
20    Q.     I am sorry.  You already said white?
21    A.     Yes.
22    Q.     Unfortunately you have to be thorough and explain
23    this stuff for the record, you being me.  Can you
24    approximate how tall he was?
25    A.     No.

J. STERLING

| | | |
|---|---|---|
| 1 | Q. | How tall are you? |
| 2 | A. | 5-foot 4. |
| 3 | Q. | Would you say he is taller than you? |
| 4 | A. | Yes. |
| 5 | Q. | I am about 5-foot 11. Would you say he was |
| 6 | taller than me? | |
| 7 | A. | No. |
| 8 | Q. | So as best as you recall, he was in between your |
| 9 | height and my height, is that fair to say? | |
| 10 | A. | Yes. |
| 11 | Q. | Can you describe his build? |
| 12 | A. | Regular build. |
| 13 | Q. | What about his hairstyle? |
| 14 | A. | I don't know. |
| 15 | Q. | Do you remember his hair color? |
| 16 | A. | No. |
| 17 | Q. | Do you remember if he had any distinguishing |
| 18 | characteristics, such as tattoos or anything like that? | |
| 19 | A. | No. |
| 20 | Q. | Do you remember how he was dressed? |
| 21 | A. | I said he was plain clothes. |
| 22 | Q. | Well, specifically? |
| 23 | A. | I don't remember. |
| 24 | Q. | Was he wearing a jacket, something else? |
| 25 | A. | He had on a jacket. |

J. STERLING

1    Q.    Do you remember what kind of jacket?

2    A.    No, I don't.

3    Q.    Can you provide any other details about the
4  specifics of his appearance?

5    A.    No, I cannot.

6    Q.    Where is your kitchen located within your home,
7  what level?

8    A.    The basement.

9    Q.    Can you get access to the kitchen from outside or
10  do you have to come in on the floor above and kind of go
11  down?

12    A.    You have to come in from the floor above to come
13  downstairs.

14    Q.    The first time that you saw this officer was
15  downstairs?

16    A.    Yes.

17    Q.    Would there have been any way for him to have
18  gotten in, other than I guess walking in the front door?

19    A.    No.

20    Q.    The front door would be located on the floor
21  above where the kitchen is?

22    A.    Yes.

23    Q.    What were you doing when you first observed him?

24    A.    I was sleeping.

25    Q.    Where is your bedroom located within the house?

J. STERLING

1           MR. LUMER:  Objection.  You can answer.
2     A.    My bedroom?
3     Q.    Yes.
4     A.    I was in the living room.
5     Q.    I see.  Where is the living room located within
6  the house?
7     A.    In the basement.
8     Q.    Where is that in relation to the kitchen?
9     A.    Right next to it.
10    Q.    Were you woken up by this officer?
11    A.    Yes, I was.
12    Q.    What was the first thing that you heard?
13    A.    I didn't hear anything.
14    Q.    Well, how did the officer wake you up?
15    A.    He walked passed me and I woke up.
16    Q.    Did he say anything to you when you woke up?
17    A.    He said, "I need to go through your basement."
18    Q.    How did you respond to that?
19    A.    I couldn't respond.  By the time he started
20  running, he was already at the door.
21    Q.    So you didn't say anything in response to him
22  saying "I need to go through your basement"?
23    A.    No.  He already had passed me.
24    Q.    Well, I will ask you why or why not.  My question
25  was simply whether or not you said anything and the answer

J. STERLING

1   to that is no?

2      A.    No.

3      Q.    Do you know where he went?

4      A.    Out the back, out the back door.

5      Q.    Of the basement?

6      A.    Yes.

7      Q.    So there is a way to get to the backyard from the

8   basement?

9      A.    Yes.

10     Q.    But there is no way to enter the basement from

11  the front yard, if I understand correctly?

12     A.    No.

13     Q.    After he went passed you, did you remain where

14  you were or did you go somewhere else?

15     A.    I remained where I was and I locked the door.

16     Q.    The door behind him?

17     A.    Yes, I did.

18     Q.    So in essence, you locked him out in the

19  backyard?

20     A.    Yes.

21     Q.    Why did you do that?

22     A.    Because he stated that he was not coming back.

23  He just said he wanted to get through.

24     Q.    What specifically do you remember him saying to

25  you as he walked by?

J. STERLING

1  A.  I don't know.  I don't know.  I don't know.
2  Q.  You said that he was pursuing somebody.  Is that
3  an assumption that you are making?
4  A.  Yes.
5  Q.  Do you know if anyone was arrested in connection
6  with this officer's presence in your backyard?
7  A.  I don't know.
8  Q.  Did you ever file any sort of complaint over the
9  fact that this officer was in your backyard?
10 A.  No.
11 Q.  Did you have an issue with the fact that this
12 officer was in your backyard and has to come through your
13 home to exit?
14      MR. LUMER:  Objection to the form.
15 A.  No.
16 Q.  Were you ever contacted by any authorities after
17 the fact in connection with whatever this officer may have
18 been doing, with the other incident?
19 A.  No.
20 Q.  So is it fair to say that once this officer left,
21 as far as you know, that is all you know?
22 A.  That is all I know.
23 Q.  Fair enough.  So let's go back to this incident
24 now.
25      So it seems like your interaction with this

J. STERLING

1  officer, I am going to try and summarize so I am clear,
2  please correct me if I am wrong, you were sleeping in your
3  living room, you were awoken to this officer passing by you
4  in your living room saying that he needs to get to your
5  backyard and go into the backyard and you locking the door
6  behind, is that fair to say?
7      A.    Fair to say.
8      Q.    Once you locked the door, did you continue to
9  watch the officer?
10     A.    No.
11     Q.    Why not?
12     A.    I went to the backyard and I didn't see him.
13  When I looked out the back door, I did not see him.
14     Q.    From where did you look out into the backyard?
15     A.    From my door.
16     Q.    From the door that he exited out of?
17     A.    Yes.
18     Q.    From the door that you locked?
19     A.    Yes.
20     Q.    Can you describe for me, as best as you can, your
21  backyard, just how it is laid out?
22     A.    You go through the backyard and it is open and I
23  have a garden. That is it.
24     Q.    Is there any separation between your backyard and
25  the backyards of the adjoining houses?

1    A.    Yes, there is.
2    Q.    What separations are there?
3    A.    On the right I have a wood picket fence, on the
4    left I have a gate.
5    Q.    Which of those two structures separates your home
6    from Nicole Agostini's?
7    A.    The wooden one.
8    Q.    Would that be the fence or the gate?
9    A.    The fence.
10   Q.    How high is that fence, as best as you can
11   approximate?
12   A.    That fence?
13   Q.    Yes.
14   A.    Taller than me.
15   Q.    Would you say it was taller than me?
16   A.    No, it is like in between.
17   Q.    Fair enough.
18         I know you said it was nighttime.  Do you recall
19   how the lighting conditions were outside?
20   A.    It was dark.
21   Q.    Do you have any artificial light in your
22   backyard?
23              MR. LUMER:  Then or now?
24   Q.    Then?
25   A.    No.

J. STERLING

1    Q.    Once the officer went outside and you locked the
2    door, how long after did you lose sight of him?
3    A.    I didn't go out the door behind him.
4    Q.    Well, I thought you said, and correct me if I am
5    wrong, I thought you said you locked the door.  He exited,
6    I assume, from that position, you were looking out the
7    door.
8    A.    I cannot see out the door.
9    Q.    Why not?
10   A.    I mean he left out the door.  I locked the door.
11   Q.    Okay.  The door, does it have a window on it?
12   A.    No, it is a solid door like that.
13         MR. FRANCOLLA:  For the record, the Witness
14         is referring to a door that is completely solid.
15   Q.    So from where you locked the door, you had to go
16   somewhere else to look into the backyard, is that fair to
17   say?
18   A.    No.  After he left and after a couple of minutes
19   passed, then I went outside to look out the back door.  I
20   went out the back door to see where he was at and he was
21   not back there.
22   Q.    My understanding is that you had gone to a window
23   or something to look out?
24   A.    No.
25   Q.    So you locked the door, waited a couple of

J. STERLING

1   minutes, then opened it and looked out?

2   A.   Yes.

3   Q.   How many minutes did you wait, approximately?

4   A.   About 10, 15 minutes.

5   Q.   During that time, during that time, did you look

6   outside at all?

7   A.   No.

8   Q.   From the moment you locked the door until about

9   10 minute or so when you opened it, you didn't look into

10  the backyard?

11  A.   No.

12  Q.   As you sit here today, do you have any idea what

13  this officer was doing in your backyard?

14  A.   No.

15  Q.   Do you know how he would of been able to exit the

16  backyard, other than going through your house?

17  A.   Through somebody else's house or through the

18  backyard.  I mean -- what do you mean?

19  Q.   Well, I guess you had described earlier in the

20  other incident that the officer asked to use your house to

21  exit, right, he was in the backyard and he walked through

22  your house to get out?

23  A.   Wherever he came from because there is a whole

24  lot of houses joined together on one side of the block and

25  the other side of the block and the yards is in the middle,

1 so I don't know where exactly where he came from or
2 whatever, but I know he was in my backyard.
3     Q.    You are talking about the other incident?
4     A.    Yes.
5     Q.    In this incident, it is fair to say that there
6 are numerous ways that the officer could of left your
7 backyard, aside from walking back through your house?
8     A.    Yes.
9     Q.    Would he have been able to enter the adjoining
10 backyards?
11    A.    Yes.
12    Q.    Do you know if he did that?
13    A.    I don't know.
14    Q.    I think you said earlier that your husband was
15 home at the time?
16    A.    Yes.
17    Q.    Do you know if he had any interaction with this
18 officer?
19    A.    No, he didn't.
20    Q.    What is your basis for that, for saying that?
21    A.    My basis for saying that?
22    Q.    Yes. How do you know he didn't have any
23 interaction?
24    A.    Because he was upstairs in his room.
25    Q.    Where is his room located in the house?